IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 2000 Session

**STATE OF TENNESSEE v. KELLY ANNE NEWMON**

**Appeal from the Circuit Court for Carroll County**
**No. 98CR-1304     Lee Moore, Judge**

---

**No. W1999-01497-CCA-R3-CD - Decided August 4, 2000**

---

This appeal arises from a guilty verdict returned by a Carroll County jury against the defendant for two counts of delivering less than 0.5 grams of cocaine. On appeal, the defendant challenges her convictions on the basis that the introduction of evidence bolstering the informant's testimony was plain error, and the evidence was not sufficient to support the verdict. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY, J., joined. DAVID G. HAYES, J., not participating.

Guy T. Wilkinson, District Public Defender, Camden, Tennessee (on appeal) and Ramsdale O'DeNeal, Jackson, Tennessee (at trial) for the appellant, Kelly Anne Newmon.

Paul G. Summers, Attorney General and Reporter; Clinton J. Morgan, Assistant Attorney General; and John C. Zimmermann, District Attorney General Pro Tem, for the appellee, State of Tennessee.

**OPINION**

As a result of two controlled buys by a police informant, the defendant was indicted on September 8, 1998, by a Carroll County grand jury on two counts of delivering less than 0.5 grams of a Schedule II controlled substance, cocaine. After a one day trial, the jury returned a guilty verdict on both counts. The defendant appealed the jury verdict, raising the following two issues:

I.   It was plain error to bolster the credibility of the informant by allowing the State to introduce evidence that other defendants she bought from pled guilty and arguing that another jury looked at her testimony favorably.

II.  The evidence was insufficient to justify a rational trier of fact from finding guilt beyond a reasonable doubt.

After a careful review of the record, we affirm the judgment of the trial court.

**FACTS**

The defendant was tried on February 11, 1999. The police informant, Debbie Ann Smothers, was the first witness called by the State. Smothers testified that she was a twenty-seven-year-old former drug user, who first met the defendant in high school. The two women became friends as adults, and Smothers stated that she went to the defendant's home to purchase drugs in 1995 or 1996. The defendant sold rock cocaine to Smothers, which she smoked, and also helped the witness sell Valium. In October 1997, Smothers approached Sergeant Johnny Hill of the Huntingdon Police Department to volunteer to work as an informant. At that time, she was trying to stop using drugs and "wanted it off the streets," because she did not want her children to smoke cocaine. The witness explained that cocaine made her want to kill herself, because she was doing anything to get it, including selling her body. She stated that she stopped using drugs sometime around November 1997, and takes daily medication.

According to Smothers, Sergeant Hill already knew the identities of several people who were selling drugs when she approached him, and she agreed to buy drugs from these individuals. Subsequently, she was involved in drug buys that resulted in three or four convictions. Smothers bought drugs from the defendant on two occasions under the supervision of Sergeant Hill. On December 22, 1997, Smothers and her ex-husband met Sergeant Hill at the high school, where the officer gave her twenty dollars to buy drugs and conducted a search of her pockets. She stated that she was only wearing a flannel shirt and blue jeans and was not wearing a coat. Smothers contacted the defendant using a cellular phone that was equipped with a tape recorder and also allowed the police to hear the conversation. The defendant told Smothers that she had the cocaine, and Smothers proceeded to the defendant's home. After being dropped off at the house by her ex-husband, Smothers found out that the defendant did not have the drugs at her house. The witness remembered a black adult female she knew from school being at the house with the defendant, along with the defendant's children. The defendant left the house for approximately ten minutes and returned with the drugs, for which Smothers paid the defendant twenty dollars. After the sale was completed, Smothers's ex-husband picked her up, and she took the rock cocaine to Sergeant Hill. She was then paid forty dollars for her participation in the purchase.

The second drug transaction occurred on January 23, 1998. Smothers and a friend met Sergeant Hill at the high school rendezvous point, where Hill searched Smothers's pockets and wired her with a transmitter. Smothers drove to the defendant's house and went inside, while her friend waited in the car. Sergeant Hill was hidden nearby. This time, the defendant had the rock cocaine at her house, and Smothers paid her forty dollars for it. Smothers testified that the amount of cocaine she received from the defendant was not worth what she paid. Back at her car, Smothers put the cocaine in cellophane and started to back out of the defendant's driveway when her car died. She made it known to Sergeant Hill and Officer Tony Lane, via the transmitter, that she was having car trouble. Pretending that a neighbor had called them, the two officers pulled up and began checking the car. Smothers was able to slip the transmitter and the cocaine to the officers. She was subsequently paid forty dollars for this buy. She admitted making another unsupervised cocaine

purchase from the defendant for her boyfriend's brother after this incident. She did so to earn twenty dollars for cigarettes and other items. Smothers also received phone calls from the defendant on a number of occasions trying to get Smothers to buy drugs.

On cross-examination, Smothers testified that none of her four children live with her. She admitted that, at the time she volunteered to be an informant in October 1997, she was still using drugs, was not working, and was receiving disability benefits. According to Smothers, she needed the money she received from the police drug buys, but she would have cooperated with the police even if she had not been paid. She explained, "I don't want my kids growing up on drugs. I do not want my kids buying drugs." She admitted that Sergeant Hill knew that she was still on drugs when she first approached him in October 1997; however, she had stopped using drugs by December 1997. She stated that she had participated in three or four other drug "busts" before participating in the first buy with the defendant on December 22, 1997.

When questioned about the search conducted on her person by Sergeant Hill before she went to the defendant's house, Smothers testified that she was wearing shoes and a big T-shirt to cover up the transmitter. Sergeant Hill made her turn all of her pockets inside out but did not make her take off her shoes during the search. She did not have a bra on at the time. Neither her ex-husband, who drove Smothers to and from the defendant's house for the December drug buy, nor his car, was searched by the officers. She remembered Sergeant Hill following her ex-husband's car until they turned onto the defendant's street and then positioning himself close enough to see the defendant's house. When she found out that the defendant had to go somewhere else to get the drugs, Smothers told her ex-husband to leave for fifteen or twenty minutes. Smothers stated that Leslie Thomas[1] was sitting in the dining room and should have heard the defendant asking Smothers how much [cocaine] she wanted and Smothers answering "[a] twenty."[2] The defendant then told Smothers that she had to go get it.

Smothers testified on further cross-examination that she currently takes Dilantin for seizures, Theodrine for lung problems related to her crack use, and Valium for grande mal seizures. She admitted that being an informant involves deceiving and lying to people and that she became good at it. She denied any arrests for selling drugs. After a jury-out hearing, the trial court only allowed defense counsel to question the witness about prior bad acts involving a citation she received for writing bad checks in 1994 or 1995. The witness stated that her addiction to drugs caused her to do this, and she had paid most of the checks. She denied making any phone calls to the defendant's father, Paul Newmon.

Sergeant Johnny Ray Hill of the Huntingdon Police Department was the next witness called by the State. In the summer and fall of 1997, Hill was put in charge of investigating drug activity

---

[1] Leslie Thomas was the black female who Smothers referred to on direct examination. This individual was present at the defendant's house when Smothers arrived on December 22, 1997, and testified at trial for the defense.

[2] From our review of the record and the Agent's Activity Log for Confidential Funds, which tracks money paid to informants, this apparently means a rock of cocaine with a market value of about twenty dollars.

in Huntingdon. He testified that he already had information about individuals involved in drug trafficking but needed to find someone who was trusted by the dealers to make the actual drug buys for the police. Sergeant Hill recalled that Smothers came to see him and volunteered to work with the police to buy drugs from some of the dealers she knew. Smothers told Sergeant Hill at that time that she was still on drugs. The officer explained that Smothers bought drugs from suspects while the police recorded the transaction on tape and observed the house. The police corroborated the information Smothers provided them on dealers with information received from other informants. Sergeant Hill's investigation targeted eight different people. He explained that Smothers was paid a sum, usually forty dollars for each completed undercover buy. The money came from a special drug fund, and all transactions were accounted for. Prior to making her first buy, the officers explained to Smothers how to enter, get the drugs, and take them to the police, as well as how to wear the radio transmitter. This device transmitted sound to Sergeant Hill's car, which was parked nearby so that he could observe the transaction. The conversations were taped, but Sergeant Hill stated that the quality of some of the tapes was very poor. This procedure was followed each time a drug buy was made.

Sergeant Hill testified that he had spoken to the defendant before the police made their first undercover drug buy from her in December 1997. On October 16, 1997, the police raided a house located three or four miles outside of Huntingdon on Highway 22 South that was being used as a distribution point for drugs.[3] During the raid, the officers found a large amount of cocaine, twenty-six grams, which was being cut up for sale. While the police were still there, the defendant called the house twice. Sergeant Hill had spoken to the defendant previously and recognized her voice when he answered the first call. Someone else answered the second call but also recognized the defendant's voice. Sergeant Hill had received additional information from Sergeant Ricky Sawyers, who lived next-door to the defendant, that there was abnormal traffic at the defendant's home consistent with illegal drug activity. People would come to the defendant's residence all hours of the day and night and stay only a few minutes before leaving. Sergeant Hill observed this activity as well.

The police decided to make the first drug buy from the defendant on December 22, 1997. Sergeant Hill testified that the officers searched Smothers's pockets before they sent her to the defendant's house, but she was not searched thoroughly. Smothers had already made several drug purchases for the police, and none of the suspects ever denied selling to her. Additionally, Hill testified that Smothers was a very small person at the time and always dressed in jeans and a shirt. She did not wear a coat, even in cold weather. After giving Smothers the transmitter and the money to buy drugs, Sergeant Hill and Chief Deputy Tony Moon went to the fire station one street over and directly in front of the defendant's residence to observe the transaction. Hill and Moon watched and listened as Smothers was dropped off in front of the defendant's house, went inside and talked to the defendant, and then saw the defendant leave the residence a short time later. She was gone approximately four or five minutes. Shortly after the defendant returned to the house, Smothers left

---

[3] As a result of the raid, Sergeant Hill stated that five or six people were charged. All either pled guilty or were found guilty by a jury.

the defendant's residence and went back to the school, where she gave the officers the crack cocaine.[4] Sergeant Hill explained that there is a crack house, referred to by locals as "The Bottom," close to the defendant's home, and she could have driven there and back within the time period she was gone during the December transaction. According to Hill, the taped conversation between Smothers and the defendant that day contained only normal conversation between friends.

The second drug purchase involving the defendant took place on January 23, 1998, at approximately 7:00 p.m. The officers met and prepared Smothers just as before. Smothers called the defendant on a cellular phone, and Sergeant Hill testified that he heard Smothers ask the defendant if she had the "stuff" there, and the defendant answered that she did. She told Smothers that she could come by and get it. The officers did not record this conversation. This time, the officers parked at the school to observe the transaction, which was a little farther away than where they parked in December. After pulling into the defendant's driveway, Smothers entered the house and came out after a short time, telling the officers via the transmitter that she thought she had been "ripped off." The amount of drugs she received was not enough for the money she paid. Sergeant Hill described essentially the same event related by Smothers in her testimony, in which Smothers's car broke down in the defendant's driveway, and the officers rescued her and retrieved the cocaine.[5] Smothers was paid forty dollars for this transaction. Ledger records showing the drug transactions for December and January were introduced into evidence through Sergeant Hill. The defendant was not arrested immediately but was arrested in June of 1998.

Hill testified that Smothers never falsified anything, tampered with evidence, or lied to him during his dealings with her as an informant. He stated that the defendant, who is the daughter of the Carroll County Circuit Court Clerk, was not targeted or selected because her father is a public official.

On cross-examination, Sergeant Hill stated that he has not had any specialized training relating to drug busts or informants; however, in the four years preceding the trial, he had been involved in thirty to forty drug transactions involving an informant. He denied that Smothers told him she was still using drugs when she volunteered to work with the police in October 1997. Sergeant Hill stated that he checked out Smothers as best he could to make sure her information about the defendant was reliable. Smothers was recommended to Hill by another officer who had utilized her in the past. He admitted that a background check on Smothers was not done but that he checked her out through other officers. He admitted that the sheriff's department has a female officer, and he could have made arrangements for her to search Smothers thoroughly before the drug buys. Hill also admitted that Smothers could have hidden something the size of a twenty dollar

---

[4]The piece of cocaine purchased from the defendant on December 22, 1997, was introduced through the testimony of Sergeant Hill. The parties stipulated to the contents of the laboratory report signed by TBI Special Agent Forensic Scientist Sandra Romanek which revealed the rock to contain .1 gram cocaine base, a Schedule II controlled substance.

[5]This rock of cocaine was introduced into evidence through Sergeant Hill, and the parties again stipulated to the TBI laboratory analysis that revealed .1 gram cocaine base, a Schedule II substance.

cocaine rock in her shoe. Smothers's ex-husband, who drove her to the first buy, was not searched, nor was his car. Smothers's car was not searched before the second buy in January but was searched when the officers pretended to be responding to a call to help Smothers with her broken down car. A friend named Robin was in the car with Smothers during the second buy. In the taped conversation of the second buy, there was no mention of anything relating to drugs between the defendant and Smothers once Smothers got to the house. Chief Deputy Moon stated that he saw a black male at the defendant's house during this transaction. He stated that Smothers denied making any phone calls to the defendant's father when he questioned her after Mr. Newmon accused her of doing so. On redirect, Sergeant Hill testified that the prosecutor and the district attorney approached Mr. Newmon after he made the accusation to get more information, but Mr. Newmon refused to give them further information.

The next witness called to testify for the State was Chief Deputy Tony Moon. Moon was part of the joint drug task force formed between the Carroll County Sheriff's Department and the Huntingdon Police Department to investigate drug activity in the county during 1997. On December 22, 1997, Moon accompanied Hill on the undercover drug buy from the defendant. This transaction was part of an investigation involving several different people. From their investigation, the police and sheriff obtained the names of some of the drug dealers before they made the undercover buys. The defendant was one of the suspects. Moon's description of the events surrounding the December undercover drug buy were essentially the same as that testified to by Hill. He also stated that the defendant was not targeted because her father was a public official. He explained that Mr. Newmon was a friend of his, and, if anything, the fact that the defendant was Newmon's daughter would have made him not want to target her.

On cross-examination, Moon admitted that no one saw the defendant go to "The Bottom" to purchase drugs on December 22, 1997, when she left the house. The officers had already established that drugs were being sold at "The Bottom" from a previous stakeout. He did not recall any statements in the taped conversation between the informant and the defendant on that day which related to a drug transaction, such as "I want to buy drugs," "Sell me a forty," or the like. Moon remembered Smothers's ex-husband being with her, dropping her off, and driving around before picking her up again. He admitted the ex-husband could have gone to "The Bottom" to buy the cocaine. He also did not remember if Hill searched Smothers before the buy and explained that whether an informant was searched depended on the situation. Moon was there only as an observer to assist Hill, and this was Hill's undercover buy. He remembered Hill telling him that Smothers said that the defendant would not let her pull up in the yard, so her ex-husband had to drop her off. Moon did not remember what Smothers was wearing that day and did not take any notes.

The State's next witness was Officer Tony Lynn Lane, who assisted Hill after the January 23, 1998, undercover drug buy from the defendant when Smothers's car broke down. He explained that Sergeant Hill called him to ask him to help his informant with her car trouble. Lane drove to the defendant's house and found Smothers's car parked in the street with a broken carburetor. Smothers gave Sergeant Hill the cocaine wrapped in the foil from a cigarette package. Hill placed the contraband in his pocket. Because the car could not be fixed, Officer Lane drove Smothers back

home.  He stated that Smothers did not lock the disabled car before it was left at the school or act as if anything valuable was in the car.

On cross-examination, Officer Lane stated that he did not know where Smothers got the drugs that she handed to Hill and that she did not hand the drugs to Hill until the officers arrived to help her with her car.

The last witness called by the State was Sergeant Richard Sawyers, a narcotics investigator for the Huntingdon Police Department.  Sergeant Sawyers lived next-door to the defendant for several years, including 1997 and early 1998.  He testified that he noticed unusual activities at the defendant's residence beginning shortly after she moved there in 1995.  Sergeant Sawyers noticed several visitors to the defendant's residence who would stay from thirty minutes to a couple of hours.  Other individuals would stay only fifteen or twenty minutes.  The traffic seemed to slow down when the task force began making arrests based on undercover buys of crack cocaine.  Sawyers also noticed the defendant leaving her house often and returning shortly thereafter.  He suspected the defendant or someone else was dealing drugs out of her house.  Because he felt it would be inappropriate for him to conduct an investigation of his next-door neighbor, Sergeant Sawyers reported the defendant's conduct to the police.  Following this testimony, the State rested its case.

The defense called Patsy Newmon, the defendant's mother, as its first witness.  Mrs. Newmon recalled getting two unusual phone calls, the first of which occurred on election night.  She stated that she answered the phone, and a young lady asked to speak to "Paul Newmon from the courthouse."  When Mrs. Newmon told the caller that her husband was not there, the caller told Mrs. Newmon that she, the caller, had a problem with her daughter.  The call struck Mrs. Newmon as unusual, because they normally do not get calls like that, and most people that call the couple know that Mr. Newmon works at the courthouse.  The next night, Mrs. Newmon answered another phone call and recognized that voice as being the caller from the night before.  Mrs. Newmon was on the line when her husband took the call.  The young lady told him, "I know your daughter is in trouble and I can help you out. . . .  I can plead the Fifth and get her out of trouble."  Mr. Newmon said, "Debbie, we know who you are."  According to Mrs. Newmon, the young lady implied that she wanted money from the couple, to which Mr. Newmon refused.  Mrs. Newmon interrupted and asked the caller to give them time to think about it.  The Newmons did not have caller ID on their phone at the time, and it was Mrs. Newmon's intention to have equipment installed to enable them to identify the caller.  Following the call, Mr. Newmon contacted Chief Deputy Moon, who was involved in the case.  Sergeant Johnny Hill and another officer met with Mr. Newmon.  Mrs. Newmon was not present during the meeting and did not know if Smothers knew her daughter.

The next witness called by the defense was Paul Reed Newmon, the defendant's father.  He testified that he is the Circuit Court Clerk, a position that he has held for nine years.  Mr. Newmon recalled receiving a telephone call one night around the time of the election.  His wife called him to the phone and told him the caller was the same person who had phoned the night before.  The woman caller told Mr. Newmon that she would "plead the Fifth" if he would pay her.  He "played along" with the caller for a few minutes and then told her he would not agree.  The caller kept asking Mr. Newmon to talk louder, and he got the impression that she was taping the conversation.  The

caller finally told Mr. Newmon, "Well, if you don't want to go along with me, by God, let your daughter spend 10 or 12 years in prison." Mr. Newmon responded, "Debbie, I know who you are and where you live, and you know there are other ways to keep you from testifying if I didn't want you to testify. There's no reason to pay you anything." He stated that he heard Smothers testify at the preliminary hearing and identified the voice on the phone as hers. Mr. Newmon contacted Chief Deputy Moon, who relayed the information to Sergeant Hill. Sergeant Hill and Sergeant Sawyers met with Mr. Newmon about the call. Mr. Newmon testified that he could not get the caller's number from the phone company or another police agency he was trying to get the number from and was unable to retrieve the number.

On cross-examination, Mr. Newmon admitted getting a visit from District Attorney General Gus Radford related to his claims about the call. General Radford told Mr. Newmon that the TBI could get the phone records if he would give them an official statement. The witness admitted that he never gave an official statement to the TBI. He denied telling General Radford that he would think about it and then told him to forget it.

The defense next called Leslie Thomas, who was present at the defendant's residence on December 22, 1997. She stated that Smothers came to the house to get a pair of tennis shoes for her daughter from the defendant. Ms. Thomas recalled that the defendant had a conversation with Smothers in the kitchen, but she did not hear what was said. She did not see or hear anything related to a drug transaction. Smothers stayed less than half an hour and left with the tennis shoes. Ms. Thomas testified that she is a frequent visitor to the defendant's residence and has never seen the defendant use or sell drugs.

On cross-examination, Ms. Thomas stated that the defendant left the house for ten or fifteen minutes to go to the store for Cokes and cigarettes after Smothers arrived. Ms. Thomas stated that the defendant was already planning to go to the store when Smothers showed up. Shortly after the defendant returned, Smothers left the house. Ms. Thomas admitted that she knew Smothers was a crack addict.

The defense recalled Sergeant Johnny Hill to the stand. He explained how Smothers was paid by the police to make undercover buys. She received twenty dollars to buy the drugs and was paid forty dollars after she brought the drugs to the police. After the rock of cocaine from the December buy was shown to the court and jury, Sergeant Hill stated that the amount of cocaine, 0.1 gram, that Smothers received from the defendant during that first buy was the appropriate size rock to have a "street value" of twenty dollars. When shown the second rock from the January buy, which also contained 0.1 gram of cocaine, Sergeant Hill stated that it could easily have a "street value" of forty dollars. He explained that the price depended on who was selling the drug. He agreed with the defense attorney that the twenty dollar December rock looked bigger than the forty dollar January rock, although the lab report showed that both had the same weight.

Additionally, Sergeant Hill testified that he was present in June 1998, when the defendant was booked after her arrest. The defendant's father, Paul Newmon, was also present. The officer testified that Mr. Newmon threatened that the informant would never testify. This threat was made

in the presence of other officers. Sergeant Hill was aware of the allegations made in November 1998 that Smothers had called his house. He reported Mr. Newmon's claims to General Radford and then made an offer to Newmon to get the TBI involved. The police offered to install equipment on the Newmons' phone so calls could be recorded, but Mr. Newmon never contacted Sergeant Hill to get any such equipment. As far as he knew, no equipment was ever installed.

Paul Newmon was recalled as the last witness for the defense. He remembered the district attorney offering to put equipment on his phone but did not remember the officers doing so. He stated that a recorder was installed on his phone shortly thereafter by the drug task force.

## ANALYSIS

## I. Plain Error

The defendant argues that the State's introduction of evidence that Smothers was involved in drug buys from other individuals which resulted in guilty pleas or guilty verdicts amounted to plain error pursuant to Tennessee Rule of Criminal Procedure 52(b). The defendant contends that this was inadmissible evidence that bolstered the informant's credibility. The State argues that the defendant waived any error by her failure to object at trial and by raising the same issue on her cross-examination of Sergeant Hill. Even if error exists, the State contends that it was harmless in light of the other evidence presented at trial. We agree with the State and conclude that any error committed was harmless.

The testimony complained of occurred during the direct examination of Sergeant Hill by the State. The district attorney was exploring the relationship that Smothers had with the police as an informant and their experience with her as far as truthfulness and reliability. A part of that testimony follows:

> Q. Now of the people that Ms. Smothers made buys from, controlled buys under your control, have those cases all been disposed of in court?
>
> A. Yes, they have.
>
> Q. What was the result in those cases?
>
> A. In each and every case, we had a guilty plea.

On cross-examination, defense counsel elicited testimony from Sergeant Hill to explain why a more thorough search of Ms. Smothers was not done before she made each of the buys from the defendant:

> Q. The procedure is, is it not, to search her (Smothers) and make sure she doesn't have any type of drug or contraband; right?
>
> A. Yes.

Q. And why is that? Why do you want to search her to make sure?

A. Just to make sure that that person is not carrying anything. . . . In Ms. Smothers' case, we had dealt with her several times before and all of her information had turned out to be true. As I had stated, we had all the other convictions and guilty pleas. So we had dealt with her on several occasions in this same type of thing.

Q. With respect to [Ms.] Smothers in these other cases, everyone pled out; didn't they? . . . Nobody said: I didn't do it and I want a jury trial.

. . . .

A. There was one gentleman that went to trial. He went to Circuit Court and was tried in front of a jury and was found guilty.

In his closing statement, the prosecutor referred to this evidence in arguing the credibility of the informant:

Was she [Smothers] testifying from the heart, the truth, or was she putting on a show for each one of you? What does she have to gain now? The case is over. She's gotten paid. Of all the people that they investigated, every one but two pleaded guilty. Another jury looked at her testimony.

However, both the prosecutor and the trial judge reminded the jury that the statements of the lawyers were not evidence:

State: [Y]ou're going to have [to] evaluate the credibility of the witnesses and whether or not the evidence backs them up -- the evidence, not what you think with your heart, not what you suspicion, and not what one lawyer or another tells you what they think, but what you hear on the evidence.

. . . .

Jury Charge by the Court: [Y]ou should understand that the statements made to you by the attorneys are not evidence. Therefore, you should disregard any argument made by the attorneys which you find is not supported by the evidence.

-10-

The defendant did not object to this testimony of Sergeant Hill or to the prosecutor's statements at trial; nor was this issue raised in the defendant's motion for a new trial. She raises it for the first time on appeal. Although the defendant's inaction amounts to a waiver of any error, we choose to address the issue *sua sponte*.

This court may review issues not properly preserved for appeal to (1) prevent needless litigation; (2) prevent injury to the public interest; and (3) prevent prejudice to the judicial process. Tenn. R. App. P. 13(b); State v. Adkisson, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994). Pursuant to Tennessee Rule of Criminal Procedure 52(b), "plain error" that affects a "substantial right" of the accused may be addressed by this court in its discretion. However, this type of error must be "an especially egregious error" that seriously compromises the fairness and integrity of the judicial system. Adkisson, 899 S.W.2d at 639. The plain error rule is to be used sparingly by this court and invoked only in exceptional circumstances in which an error has had "an unfair prejudicial effect which undermined the fundamental fairness of the trial." Id. at 639, 641-42.

In determining whether "plain error" has occurred, we look to the following factors: (1) whether the record clearly establishes what happened in the trial court; (2) whether a clear and unequivocal rule of law was violated; (3) whether a substantial right of the accused was adversely affected; (4) whether the accused waived the issue for tactical reasons; and (5) whether our consideration of the error is necessary for substantial justice to be served. Id. at 641-42. In the event that an error is found to be reviewable pursuant to Tennessee Rule of Appellate Procedure 13(b) or Tennessee Rule of Criminal Procedure 52(b), reversal of the conviction is not warranted if the error is found to be harmless. Adkisson, 899 S.W.2d at 642. In other words, an error that does not affirmatively affect the outcome of the trial is not reversible error. See Ruff v. State, 978 S.W.2d 95, 98 (Tenn. 1998).

We conclude that the admission of the testimony about police convictions of other defendants involved in undercover buys with Smothers was, at most, harmless error. Pursuant to Tennessee Rule of Evidence 608(a), evidence of a witness's truthful character in the form of opinion and reputation is only admissible after the witness's truthfulness has been attacked. Specific acts that support the witness's credibility may only be inquired into upon cross-examination of a character witness under the conditions stated in the rule. The record shows that defense counsel attacked Smothers's truthfulness during cross-examination by implying that she was not properly searched before the buy and could have had the cocaine on her person when she went to the defendant's house to make the buy. Defense counsel also questioned her about using lies and deceit to make undercover buys. During the questioning of Sergeant Hill, the State elicited testimony about other defendants who had successfully been convicted or pled guilty based on undercover buys by Smothers. It appears from the record that the purpose of this line of questioning was to show that Smothers was a reliable informant and had not tampered with or planted the evidence used against the defendant. Defense counsel followed up with questions on the same subject related to why such a cursory search of the informant was conducted before the buys from the defendant took place. There was also an inference by the defense that the defendant was targeted by the informant because she was the daughter of a public official who could be blackmailed. This evidence about the informant's reliability was related to other issues in the case, such as the specific procedures used

by the police in preparing Smothers to make the undercover buys, some of which were raised by the defense.

Even if we assume that this evidence was improperly admitted, we fail to see how this constitutes reversible error. The defendant did not object to any of this testimony and, in fact, explored those same facts on cross-examination. The prosecutor's closing remarks about another jury believing the informant, if improper, were cured with his statements to the jury that they were to look at the evidence and not at the opinions of the lawyers. The judge also instructed the jury to disregard the statements of the lawyers which did not match the evidence. In light of the strength of the State's case founded on the physical evidence, the informant's testimony, and that of the police officers, one of whom was the defendant's next-door neighbor, we cannot conclude that the admission of the bolstering evidence more probably than not affected the judgment or would have resulted in prejudice to the judicial process pursuant to Tennessee Rules of Appellate Procedure 13(b) and 36(b). Ruff, 978 S.W.2d at 98. For the same reason, we cannot conclude that this error affected the outcome of the trial on the merits pursuant to the plain error doctrine of Tennessee Rule of Criminal Procedure 52(a). Ruff, 978 S.W.2d at 98. This issue is without merit.

## II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to convict her, because: (1) the informant's credibility was bolstered by the outcome of other cases she was involved in; (2) the informant was not properly searched before making the buys from the defendant; and (3) the informant attempted to extort money from the defendant's father in exchange for not testifying. The State argues that the evidence against the defendant was strong and sufficient. Smothers testified that she participated in two undercover buys from the defendant, and the defense did not offer any evidence to the contrary. After reviewing the record, we conclude that there was sufficient evidence to convict the defendant.

The defendant's initial presumption of innocence is lost following a jury conviction and replaced with a presumption of guilt; thus, on appeal, the burden is now shifted to the defendant to prove the insufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This court must affirm the convictions unless the evidence presented at trial was so deficient that no rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). This rule has been found by our courts to be applicable to a conviction based on direct or circumstantial evidence or a combination of both. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990).

In determining whether the evidence was sufficient to support a conviction, we do not reweigh the evidence or substitute our own inferences for those of the trial court. Tenn. R. Crim. P. 33(f); State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996); State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Furthermore, the State is entitled to the strongest legitimate view of the evidence presented and all reasonable inferences drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368 (1993). A jury

verdict accredits the testimony of the State's witnesses and resolves all conflicts in favor of the State's theory. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

The defendant was convicted of two counts of delivering less than 0.5 grams of cocaine, a Class C felony, pursuant to Tennessee Code Annotated § 39-17-417:

> (a) It is an offense for a defendant to knowingly:
>
> . . . .
>
> (2) Deliver a controlled substance[.]
>
> . . . .
>
> (c) A violation of subsection (a) with respect to:
>
> . . . .
>
> (2) Any other Schedule II controlled substance, including cocaine in an amount of less than point five (.5) grams, is a Class C felony. . . .

Because the State gets the benefit of all credibility determinations on appeal, any doubt about the informant's credibility is resolved in the State's favor. Viewing the evidence in the light most favorable to the State, we find that there was more than enough evidence presented at trial for a rational jury to find beyond a reasonable doubt that the defendant delivered less than 0.5 grams of cocaine to the informant on two occasions. Apparently, the jury either did not believe Mr. Newmon's story about the extortion phone call or did not give it much weight in determining the guilt or innocence of his daughter. There was a substantial amount of other evidence from independent witnesses, such as law enforcement officers, who connected the defendant with drug sales, as well as physical evidence gathered by Sergeant Hill in the controlled buys from the defendant. This evidence was essentially undisputed by the defense, other than the testimony of Leslie Thomas, which did not prove that the defendant did not sell drugs to the informant. As a result, we cannot conclude that a rational trier of fact could not have found all of the essential elements of the crime beyond a reasonable doubt. This issue is also without merit.

## CONCLUSION

Upon our *de novo* review, we find that any error committed by admission of testimony bolstering the informant's credibility was harmless and does not require reversal. Furthermore, the evidence was sufficient for a rational jury to find every element of the offense upon which the

defendant was convicted beyond a reasonable doubt.  We, therefore, affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE